### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW MEXICO



**STEVEN LEEWRIGHT,**

**Plaintiff,**

vs.

**GARY E. JOHNSON, Governor of New Mexico,**
**NEW MEXICO DEPARTMENT OF CORRECTIONS,**
**ROBERT J. PERRY, Secretary of Corrections,**
**JOHN SHANKS, Director of Adult Prisons,**
**JERRY TAFOYA, Deputy Corrections Secretary,**
**JEFF SERNA, Interstate Compact Coordinator,**

CIV 0u     1 5 6 0 SC

and

**WACKENHUT CORRECTIONS CORPORATION,**
**ELOY MONDRAGON, Former Warden,**
**RALPH LUCERO, Security Chief**

and

**RONALD ANGELONE, Virginia Corrections Director,**
**STANLEY K. YOUNG, Wallens Ridge State Prison Warden,**
**WARDEN HARVEY, Wallens Ridge State Prison Associate Warden,**
**C.O. COCHRANE, C.O. NECESSARY, and C.O. JOHN DOES,**

and

**TRANSCOR AMERICA, INC., a Tennessee Corporation,**

**Defendants.**

### COMPLAINT FOR VIOLATIONS
### OF CONSTITUTIONAL, CIVIL, AND STATUTORY RIGHTS

Plaintiff Steven Leewright presents the following Complaint seeking declaratory,

compensatory, exemplary, and injunctive relief from Defendants' denials and violations of

his civil and constitutional rights, stating as follows:

1.     Plaintiff is **Steven Leewright**. At the end of August 1999, Plaintiff was a prisoner in E-Pod at the Guadalupe County Correctional Facility, the Wackenhut Corporation prison in Santa Rosa, New Mexico.

2.     The New Mexico Defendants are **Gary Johnson**, New Mexico Governor; the **New Mexico Department of Corrections** and **Robert J. Perry**, Secretary of Corrections; **John Shanks**, Acting Deputy Secretary and Director of Adult Prisons; **Jerry Tafoya**, Deputy Secretary; and **Jeff Serna**, Deputy Secretary and Interstate Compact Coordinator.

3.     Defendants include the **Wackenhut Corrections Corporation, Eloy Mondragon,** former Warden of the Guadalupe County Correctional Facility**, and Ralph Lucero,** former Chief of Security at the Wackenhut Corporation Prison in Santa Rosa, New Mexico.

4.     Defendant **Ronald Angelone** is the Virginia Corrections Department Director and **Stanley K. Young** is the Warden of Wallens Ridge State Prison. **Corrections Officer Cochrane** and **C.O. Necessary** are two Virginia correctional officers identified by Plaintiff as those participating in violent and abusive misconduct against him. **C.O. John Does** are the other Virginia corrections officers whose names are not known to Plaintiff but who personally, deliberately, and maliciously inflicted physical and mental injury on Plaintiff.

5.     Defendants Gary Johnson, Robert J. Perry, John Shanks, Donna Wilpolt, Jerry Tafoya, Jeff Serna, Eloy Mondragon, Ronald Angelone, Stanley K. Young, C.O. Cochrane, C.O. Necessary, and C.O. John Does are sued in their individual as well as their official

2

capacities. The individually named Defendants, including Governor Johnson and Secretary Perry, Warden Young, Warden Harvey, C.O. Cochrane, C.O. Necessary, and C.O. John Does are directly, individually, and personally involved in the acts and omissions that violated Plaintiff's rights and caused the damages described herein.

6.    In addition to their personal involvement, Defendants Gary Johnson, Robert J. Perry, John Shanks, Ronald Angelone, Stanley K. Young, and Warden Harvey held supervisory or policy-making authority and control over those who did directly inflict punishment, pain, and deprivations of civil and constitutional rights on Plaintiff.

7.    Jurisdiction of the Federal Court is invoked pursuant to the Court's federal question jurisdiction under 42 U.S.C. Sections 1983, 1985, 1986, and the laws and Constitutions of the United States and the State of New Mexico.

8.    At the time of filing of this Complaint, Plaintiff is not incarcerated and therefore is not subject to the restrictive provisions of the Prison Litigation Reform Act..

## FACTUAL ALLEGATIONS

9.    On September 3, 1999, Defendants transferred Plaintiff and other minimum and medium security prisoners from the Guadalupe County Correctional Facility ("GCCF") in Santa Rosa, New Mexico, to Wallens Ridge State Prison ("WRSP") in Big Stone Gap, Virginia, a Supermax Prison, as punishment for alleged participation in the killing of a guard and a riot at the prison in Santa Rosa on August 31, 1999.

3

10.     Plaintiff was a minimum security inmate who was not supposed to be housed in a medium security prison. Nonetheless, prior to August 31, Plaintiff had been housed in E-Pod at the GCCF for about two months.

11.     Plaintiff did not participate in the killing of the guard or the riot.

12.     Defendants have not charged Plaintiff with any misconduct; they have not given him notice of any charges and have not held any hearing.

13.     Although the prison was relatively new, by August 1999 the provision of correctional services at the prison in Santa Rosa was far beneath reasonable and adequate standards of corrections management and operations.

14.     Classification and disciplinary systems were not functioning and Defendants were ignoring crucial institutional security issues and threats. The prison was built with serious design and structural flaws. The prison was understaffed and the staff was inexperienced and poorly trained.

15.     Near the end of August, 1999, following serious incidents of violence at private prisons around the State, Governor Johnson expressed his concern about the differences between public and private corrections facilities.

16.     According to Governor Johnson and Corrections Secretary Perry, prisoners at private prisons who were involved in violent incidents were being sent back to the State-run prisons, where living conditions were more comfortable than at the private prisons. Governor Johnson announced a new policy of sending such prisoners out-of-state instead.

4

17.    On Friday, August 27, 1999, the Corrections Department Defendants posted a Notice "in every area where inmates have movement..."

**ATTENTION:**

**THIS DOCUMENT IS POSTED FOR INFORMATION TO ALL INMATES:**

**ANY FURTHER INCIDENTS OF VIOLENCE WILL RESULT IN TRANSFER OF INMATES TO OUT OF STATE FACILITIES.**

**YOU WILL NOT BE MOVED TO NEW MEXICO PRISONS, BUT WILL BE MOVED BASED ON EMERGENCY TRANSFERS TO INSTITUTIONS VIA THE INTERSTATE COMPACT AGREEMENT AND HOUSED THERE FOR AN INDEFINITE AMOUNT OF TIME.**

**YOUR INSTITUTION WILL BE LOCKED DOWN UNTIL SUCH TIME AS THE AFFECTED INMATE TRANSFERS HAVE OCCURRED.**

**STATE OF NEW MEXICO CORRECTIONS DEPARTMENT**

(EXHIBIT 1). The inmates correctly interpreted this Notice as a threat and a challenge.

18.    The posting of the Notice at GCCF was done with the knowledge and approval of Governor Johnson, Secretary Perry, John Shanks, and Eloy Mondragon. The Notice was posted as part of a plan and policy of the State of New Mexico and the Department of Corrections to threaten and intimidate prisoners with out-of-state transfers to worse conditions of confinement.

19.    On Monday, August 30, 1999, there was an assault on two inmates in E-Pod at the GCCF. Although prison officials knew who the assailants were, they were not placed in segregation and at least one of the known assailants was apparently involved in the fatal stabbing of Officer Ralph Garcia in E-Pod just a day later, on August 31, 1999.

5

20.     Prior to and on August 31, 1999, Warden Mondragon, Major Lucero, and the New Mexico Corrections Department Defendants had specific and direct information about the impending prison violence, yet they did nothing about the information they had.

21.     On the evening of Tuesday, August 31, 1999, a prisoner attacked another prisoner in the Gym and the inmates were ordered to return to their units. Following the murder of the guard in E-Pod, some inmates set fires and destroyed property.

22.     The next day, September 1, 1999, Corrections Secretary Perry issued a press release promising that "I will have a firm and swift response to this incident."

23.     On September 3, 1999, Corrections Secretary Perry announced:

> . . . . the immediate transfer of approximately 120 inmates incarcerated at the Guadalupe County Correctional Facility in Santa Rosa, to the Wallens Ridge Correctional Facility in Big Stone Gap Virginia.
>
> . . .
>
> The 120 inmates are the individuals from housing unit one, pods A & E, who participated in Tuesday nights' riot that resulted in the vicious killing of Correctional Officer Ralph Garcia.

Perry also announced that:

> The Wallens Ridge Correctional Facility is a Super Max Level 6 Prison, one of only two in the nation. The 120 inmates from GCCF will remain at Wallens Ridge Correctional Facility indefinitely.  While at WRCF the inmates will be locked down for most of the day, programmed in their cells, and under the constant supervision of Correctional Officers armed with 12 gauge combat shotguns.

**A Trip to Virginia**

24.     Early on the morning of Friday, September 3, 1999, Santa Rosa prison guards placed Plaintiff on a bus. He was chained around the waist, handcuffed, and had shackles placed on his ankles. Around 3 a.m. a convoy of about 20-vehicles left Santa Rosa for Albuquerque.

25.     Following a wait of several hours in buses on the runway at Kirtland Air Force Base, Plaintiff and the other Santa Rosa prisoners were loaded by federal marshals into an airplane for a three-hour trip. Upon their arrival at a small Tennessee airport the prisoners were forced to wait for hours without water in hot vans with windows sealed shut.

26.     The State of Virginia had recently opened its two new Supermax Prisons, Red Onion and Wallens Ridge. Those prisons were designed and intended to confine, control, and punish the worst and most violent prisoners in the country.

27.     Until they arrived at Wallens Ridge State Prison Plaintiff and the other New Mexico prisoners had no idea where they were being sent.

**Prisoners Brutalized**

28.     After arrival, Leewright and the other New Mexico prisoners were kept in vans without any air circulation for about two hours. After about another two hours they arrived at Wallens Ridge in the early afternoon, Plaintiff and the others were again kept in the van with no circulation.

29.     Leewright and the other prisoners in the van with him begged for water and a chance to use the bathroom. Although the officers around them gave water to their dogs and

7

threw water on the ground, they would not allow the prisoners either water or a chance to use bathroom facilities.

30.     After more than six hours in the hot van, Leewright suffered a heat stroke. He passed out and suffered temporary paralysis and convulsions. He urinated on himself. Other prisoners unsuccessfully attempted to secure medial attention for Leewright.

31.     Around midnight Leewright was brought into the prison from the van. Upon arrival at Housing Unit C Plaintiff was greeted by seven or eight officers. They wrenched his arms behind his back, grabbed him by the hair and pushed his face into the ground. Plaintiff's shoulder popped out of its socket and he was in extreme pain.

32.     One of the officers said to Plaintiff, "Welcome to Hell, boy; we'll take care of you."

33.     Defendants then placed Plaintiff in a Segregation cell, where he remained for the next 35 days. On his arrival at the cell, a Sergeant said, "You speak English, Taco Bell? I don't want there to be no misunderstanding between us." Plaintiff responded by telling the Sergeant "I speak better English than all of you put together." The guards hit Plaintiff repeatedly in the stomach, sternum, and kidneys. Although he was still shackled and handcuffed one of the guards shocked Leewright with an electroshock weapon.

34.     Before leaving the cell, the Sergeant said: "You don't get out of line with us here; I will bury your spic ass under these prison walls; we've done it before." The guards pulled Plaintiff's arms through the port in the door before unlocking his handcuffs. They

8

then ordered him to sit on the floor and not move until they came back and told him to move. Plaintiff remained sitting on the floor for more than an hour.

**Supermax Segregation in Virginia**

35.     Defendants kept Plaintiff alone in a small cell, denying him any meaningful programs or activities, opportunity for exercise and recreation, medical, dental, and psychological attention, access to books or law library, telephone calls and other human contacts.  Defendants ordered Plaintiff not to look out the window, not to look at guard's faces, and not to attempt to communicate with other prisoners.  He was threatened with beatings if he failed to comply with any of the Defendants' demands, no matter how unreasonable.

36.     During the time in Segregation Defendants kept Plaintiff in a constant state of terror; Defendants threatened Leewright with genital mutilation, sodomy, and physical assault.  Racially motivated verbal assaults occurred almost daily.

37.     Without justification Defendants did not allow Plaintiff to shower for more than two weeks. On one occasion C.O. Cochrane walked by Plaintiff's cell and told another guard that Plaintiff "don't get no shower; he's a wetback beaner from Mexico."

38.     Without justification Defendants denied Plaintiff any recreation for about three weeks. Defendants did not allow Plaintiff to make any telephone calls for over a month. He made his first call to his wife over a month after his arrival at WRSP.

39.     The WRSP staff repeatedly told Plaintiff and the other New Mexico prisoners that they were being kept in Segregation and being treated harshly because the New Mexico

9

corrections officials reported that the prisoners from New Mexico had killed a guard and started a riot.

40.     The Virginia Defendants unreasonably and cruelly humiliated and threatened Plaintiff, and in all respects subjected him to cruel, harsh, and unusual conditions of control and confinement which were far different and more oppressive than any of Plaintiff's prior New Mexico prison experiences.

41.     At Wallens Ridge Plaintiff was subjected to extraordinarily oppressive and degrading measures, including absolute denial of privacy, strict control and limitation of movement, removal of social contact, absence of meaningful activity, extreme forms of punishment and behavioral modification, and continual threats of physical injury or death.

42.     During his first 35 days at Wallens Ridge Plaintiff was never allowed out of his cell without first being stripped, searched, shackled, chained, and handcuffed.  A copy of the Wallens Ridge "security" order regarding strip searches is attached as EXHIBIT 2.

43.     In addition to suffering the traumatic stress of witnessing the killing of the guard at Santa Rosa, Plaintiff was in a constant state of fear while he was at WRSP. He suffered nervous dysfunctions and couldn't sleep or eat properly.  Plaintiff requested, but never received, medical and psychological help.

44.     At the time of his transfer to Wallens Ridge Plaintiff was not a gang member, he was not an escape risk, he had not engaged in any violent activity in or out of prison, and he was not a troublemaker of any sort.

10

45.   Defendants have not given any reason or explanation for sending Steven Leewright to Wallens Ridge and confining him in the Segregation Unit at the Supermax prison..

**The Trip Home**

46.   Defendants returned Plaintiff to New Mexico on or around November, 11, 1999.  Prior to placing him in a van owned and operated by Defendant Trans Corp, the Wallens Ridge Corrections Officers placed Plaintiff in handcuffs with a lock-box over the cuffs restricting movement, a belly chain strapping the lock-box to the chain, and shackles on the legs, also tied to the lock-box.  The restraints totally restricted Plaintiff's movement and caused great strain, discomfort and pain.  Eating and other physical activities and movements were extremely painful.

47.   Plaintiff was restrained in the chains, cuffs, and shackles throughout more than 72-hours in the vans.

48.   As a result of his treatment on the trip back to New Mexico Plaintiff suffered great pain and severe discomfort.  The cruelly restrictive restraints were reportedly part of the policy and practice of Transcor America, Inc., the owner and operator of the transit van.

**Santa Fe-South, New Mexico Supermax**

49.   Upon arrival back in New Mexico, Transcor delivered Plaintiff to a Segregation Unit at the Penitentiary of New Mexico's South Facility.

11

50.    For the next nine months Plaintiff was again denied minimal recreation, programs, and access to a law library. His calls and visits were restricted and he was kept in chains, shackles, and cuffs during visits and other times out of his cell.

51.    Defendants had no reason to treat Plaintiff as they did. From the start, he did nothing wrong and participated in no disruptive or threatening behavior. To the contrary, throughout his experiences at Wallens Ridge, Santa Rosa, and Santa Fe prisons, Plaintiff had between four and eight "points" and was supposed to be classified as a minimum restrict prisoner.

52.    On November 13, 1999, Defendants formally placed Plaintiff in involuntary segregation. The justification for the "Committee Action" was:

> Continue Invol Ad Seg Class B based on his alleged involvement in the 9-31-99 GCCF disturbance where a staff member was killed, prompting his transfer to an out of state facility. On 11-13-99 he was returned to N.M. and transferred to the South Unit.

On November 17, 1999, another Classification Committee review added plans to "continue placement pending completion of Investigation."

53.    On December 15, 1999, and January 12, 2000, the Committee said it would:

> Continue Invol Ad Seg (Class B) based on his alleged involvement in a disturbance at GCCF which prompted his immediate transfer to Virginia. His placement in any general population setting poses a threat to the security of the institution.

Also on November 15, 1999, Plaintiff received an "Administrative Segregation Placement Form" stating that his:

. . . placement is based on the alleged involvement in a disturbance while assigned to Guadalupe County Detention Center on August 31, 1999. This resulted in your immediate transfer to a penal institution in the State of Virginia. Your presence in any general population poses a threat to the Security of the institution warranting Administrative Segregation placement pending review of the ASCC.

EXHIBIT 3.

54.     In April, 2000, Defendants classified Plaintiff as a minimum restriction prisoner; however, his conditions of confinement in the maximum segregation unit continued and he was denied the less restrictive conditions to which he was entitled.

55.     By April 6, 2000, the Administrative Segregation Classification Committee continued to report that Plaintiff was in involuntary segregation because of his "alleged involvement in a disturbance at GCCF on 8-31-99." The Committee also reported that "No further information concerning his involvement has been received." EXHIBIT 4.

56.     Throughout the events described herein, Defendants forced Plaintiff to comply with arbitrary and unfair rules, regulations, policies and practices. Defendants have physically and emotionally attacked and cruelly and maliciously abused Plaintiff and inflicted terror, pain, injury, and humiliation without any valid reason, just cause, or due process.

## COUNT 1

## VIOLATIONS OF THE RIGHT TO DUE PROCESS

57.     After the inmate disturbance at Santa Rosa Defendants selected Plaintiff for transfer to the prison in Virginia without conducting any investigation, without stating any valid reason or justification, and without holding any hearing.

58.     The Fourteenth Amendment to the United States Constitution and Article II, Section 18, of the New Mexico Constitution provide the rights to due process and equal protection of the laws.

59.     Defendants' transfer of Steven Leewright to Virginia in chains and shackles, his extended misplacement in the Segregation Unit of a Super maximum security prison in Virginia, and the imposition of cruelly restrictive conditions of confinement constitute atypical and significant hardships and deprivations of Plaintiff's fundamental rights and interests.

60.     Defendants' acts and omissions and their treatment of Steven Leewright described herein violate commonly accepted norms of human, social, personal, and official conduct, behavior, and decency, and constitute human rights violations which are truly unconscionable and offensive to the concepts of ordered liberty and justice.

61.     Despite his conviction and sentence, Plaintiff has a substantial residual liberty interest which Defendants have denied or seriously compromised by their acts and omissions.

62.     New Mexico's denial of Plaintiff's right to due process resulted in the forced transfer to Virginia. At WRSP the Virginia Defendants exhibited a pattern and practice of use of excessive force and deliberate indifference to that use of force that compounded and exacerbated the initial injustice perpetrated against Plaintiff and constituted additional violations of Plaintiff's right to procedural and substantive due process of law.

63.     Without reason or justification in fact, Defendants continued to treat Plaintiff as if he had participated in the riot or murder of the guard at GCCF even though they knew that he had not been involved in any way in the August 31, 1999, violence.

64.     The New Mexico Defendants continued reclassifying Plaintiff for maximum administrative segregation even though they knew that there were no charges against him, there was no investigation underway, and there had never been an opportunity for Plaintiff to be heard.

65.     Defendants are liable for the damages proximately resulting from their violations of Plaintiff's civil and constitutional right to due process.

### COUNT 2

### VIOLATIONS OF THE RIGHT TO BE FREE
### OF CRUEL AND UNUSUAL PUNISHMENT

66.     The preceding allegations and claims are adopted.

67.     At the time Defendants transferred Plaintiff to Wallens Ridge, Plaintiff was a non-violent individual who had no disciplinary infractions or misconduct on his prison record.

68.     By subjecting Plaintiff to the most harsh and extreme conditions of confinement and punishment and by the mistreatment of Plaintiff described herein, Defendants have cruelly and unusually inflicted punishment that goes far beyond the bounds of any acceptable or necessary treatment.

69.     At all times material to this Complaint, Defendants knew or should have known that Steven Leewright had nothing to do with the killing of the guard or the disturbance that followed. They also knew, and it was clearly foreseeable, that sending Plaintiff and other minimum and medium security prisoners like him to a Supermax penitentiary would inflict serious emotional harm and damage, particularly if they were innocent of any wrongdoing.

70.     Defendants have established a pattern and practice of using unnecessary and excessive force which is neither justified or excused by any legitimate penological or correctional policies or practices. The force used against Plaintiff was not motivated by any effort to restore order or maintain the security of the prison. To the contrary, the force used against Plaintiff was arbitrary, unreasonable, vicious and malicious.

71.     The New Mexico, Virginia, and Wackenhut Defendants, as well as the Transcor Defendant, are liable for the damages, including but not limited to damages for mental and emotional distress and physical pain and suffering, caused by their infliction of cruel and unusual punishment on Plaintiff in violation of the Eighth Amendment to the United States Constitution and Article II, Section 13, of the New Mexico Constitution

### COUNT 3

### VIOLATIONS OF THE RIGHT TO BE FREE
### OF UNREASONABLE SEARCHES AND SEIZURES

72.     The preceding allegations and claims are adopted.

73.     Throughout the time he was transported to and from Wallens Ridge State Prison and while he was at Wallens Ridge, Plaintiff was repeatedly and painfully restrained, shackled, handcuffed, and required to endure long periods of distress and discomfort.

16

74.     The Fourth Amendment to the United States Constitution and Article II,

Section 10, of the New Mexico Constitution prohibit unreasonable searches and seizures.

75.     The Virginia Defendants forced Leewright to submit to numerous strip

searches, especially while in the Segregation Unit, where prisoners are searched every time

they leave their cell. A Wallens Ridge memo details the procedure:

> Any time a strip search is conducted the inmate will be required to strip off all
> his clothing, turn around slowly, put his hands on his buttocks, spread his
> buttocks, squat to the ground while buttocks is still spread, and cough hard
> twice.
>
> This procedure will be followed any time a segregation inmate leaves his cell
> for any reason. There will be no exceptions to this procedure.

(EXHIBIT 5).

76.     While he was at WRSP, Plaintiff was routinely and unnecessarily subjected to

physical restraints and seizures, including use of shackles, handcuffs, chains, stun guns, and

other restraint devices and weapons, without any penological justification but with the intent

of threatening and inflicting pain and causing injury.

77.     While he was at WRSP, Plaintiff was routinely and unnecessarily subjected to

searches, including use of strip searches and audio and video surveillance, with attendant

physical and psychological invasions of his remaining privacy rights, without any penological

justification but with the intent of degrading, humiliating, oppressing, damaging, and

inflicting pain and injury.

78.    Defendants routinely, repeatedly, and unnecessarily used the restraint devices and searches for the purpose of inflicting pain and psychological damage without any penological justification.

79.    By their policies, procedures, acts, and omissions, Defendants knowingly, deliberately, and unreasonably removed and denied the residuum of privacy and personal rights retained by Steven Leewright.

80.    Both New Mexico and Virginia Defendants are liable for the damages resulting from their violations of Plaintiff's fundamental right to be free of unreasonable, unwarranted and unjustified searches and seizures.

## COUNT 4

## VIOLATION OF INTERSTATE COMPACT

81.    The preceding allegations and claims are adopted.

82.    Defendants have entered into an Interstate Compact and contracts and understandings among Wackenhut Corporation, Guadalupe County, and the New Mexico and Virginia Departments of Corrections.

83.    On September 3, 1999, New Mexico Corrections Secretary Robert Perry and Virginia Corrections Director Ron Angelone entered into a Memorandum of Understanding providing for the transfer of the New Mexico prisoners to Wallens Ridge State Prison. (EXHIBIT 5).

18

84.    The Interstate Compact, codified as State law at 31-5-17 NMSA (2000), provides that inmates sent to another state's institutions "shall be treated in a reasonable and humane manner . . . .."

85.    The Compact further provides that confinement in another state "shall not deprive any inmate so confined of any legal rights which said inmate would have had if confined in an appropriate institution of the sending state."

86.    Defendants have breached the provisions of the Interstate Compact by failing to treat Plaintiff and others "in a reasonable and humane manner" and by failing to provide Plaintiff with the same rights he "would have had if confined in an appropriate institution" in New Mexico.

87.    The New Mexico Defendants closely monitored and oversaw the policies, practices, and activities of the Wackenhut and Virginia Defendants.  The New Mexico Defendants are fully aware of the incidents and allegations contained herein, yet they have continued to make official and media denials of the same facts they know to be true.

88.    Plaintiff is a direct, implied, and/or third-party beneficiary of the interstate compacts, other New Mexico and Virginia laws, rules and regulations, and other agreements and contracts between and among the Defendants.  Plaintiff has been damaged as a result of Defendants' breach of the Interstate Compact, other New Mexico and Virginia laws, rules, and regulations, and other contracts and agreements between and among the Defendants and Defendants are liable to Plaintiff for damages sustained as a proximate result of their misconduct and breaches of law, rule, compact, contract, and agreement.

## COUNT 5

### SUPERVISORY AND MANAGEMENT LIABILITY

89.   The preceding allegations and claims are adopted.

90.   The denials of due process rights and the gratuitous use of force described herein evidence malicious attempts to inflict punishment and injury, rather than good faith efforts to maintain order and the security of the institution.

91.   Defendants Johnson, Perry, Angelone, Young, and Harvey failed to monitor and control the excessive use of force against Plaintiff. In fact, by their false and provocative allegations against Plaintiff and the other New Mexico prisoners transferred to Wallens Ridge, Defendants encouraged and condoned such use of force and such harsh and excessive conditions of confinement.

92.   Defendants engaged in a pattern and practice of using excessive force and of demonstrating deliberate indifference to the rights and interests of Plaintiff and other New Mexico prisoners. Defendants are liable for damages resulting from their excessive use of force and their deliberate indifference to Plaintiff's rights.

## COUNT 6

### CONSPIRACY

93.   The preceding allegations and claims are adopted.

94.   Defendants met, conversed, planned, and arranged between and among themselves and with their subordinates to execute the transfer, placement, and punishment of Plaintiff and the other New Mexico prisoners at Wallens Ridge State Prison.

95.     Defendants have acted individually and together with each other and other government officials and employees to plan, cause, and effect the transfer of Plaintiff and other prisoners to Wallens Ridge State Prison knowing that the transfer and placement would inflict extraordinary physical and emotional pain, suffering, and damage.

96.     Defendants have acted individually and together with each other and other government officials and employees to harm and injure Plaintiff through the excessive uses of force and violations of civil rights described herein.  Defendants have acted intentionally and negligently.

97.     Even after Defendants returned Plaintiff to New Mexico they continued to meet and conspire to maintain the pretense that he had somehow "participated in" the "disturbance" at the GCCF on August 31, 1999.

98.     Plaintiff is entitled to damages and other relief for injuries resulting from Defendants conspiracy and violations of his constitutional rights.

## COUNT 7

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, AND CLAIM FOR EXEMPLARY AND PUNITIVE DAMAGES

99.     The preceding allegations and claims are adopted.

100.    Defendants' counsel and others provided a Notice of Tort Claims to the State of New Mexico within 90 days of the September 3, 1999, transfer to Virginia.

21

101.   Defendants' conduct described herein was willful, wanton, deliberate, malicious, Defendants intended to and did punish and inflict pain and emotional harm upon Steven Leewright for acts he did not commit, as described herein

102.   Defendants have acted with deliberate and utter indifference for the rights of Steven Leewright; their conduct in this case is shocking and egregious; it goes far beyond the bounds of human decency.

103.   Plaintiff is entitled to an award of exemplary and punitive damages in an amount no less than Two Million Dollars to deter and prevent Defendants and others of similar corrupt and perverse mind and intent from committing such offensive acts in the future.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the award of the following relief:

A.   Declaratory and compensatory relief for damages resulting from violations of Plaintiff's liberty interests and rights to due process of law, including but not limited to damages for pain, injury, suffering, and emotional distress.

B.   Declaratory and compensatory relief for damages resulting from violations of Plaintiff's right to be free of unreasonable searches and seizures and cruel and unusual punishment.

C.   Declaratory and compensatory relief for damages resulting from violations of the interstate compact and other agreements among the parties.

22

D.      Exemplary and punitive damages to discourage and prevent such and similar

acts by Defendants and others in the future in the amount of at least Two Million Dollars.

E.      Costs of this action and reasonable attorneys' fees.

F.      Such other and further equitable or legal relief as the Court deems just, proper,

and necessary.

Respectfully submitted,

Paul Livingston
Attorney for Steven Leewright
P.O. Box 90908
Albuquerque, NM 87199
(505) 823-4410

# ATTENTION:

# THIS DOCUMENT IS POSTED FOR INFORMATION TO ALL INMATES:

ANY FURTHER INCIDENTS OF VIOLENCE WILL RESULT IN TRANSFER OF INMATES TO OUT OF STATE FACILITIES.

YOU WILL NOT BE MOVED TO NEW MEXICO PRISONS, BUT WILL BE MOVED BASED ON EMERGENCY TRANSFERS TO INSTITUTIONS VIA THE INTERSTATE COMPACT AGREEMENT AND HOUSED THERE FOR AN INDEFINITE AMOUNT OF TIME.

YOUR INSTITUTION WILL BE LOCKED DOWN UNTIL SUCH TIME AS THE AFFECTED INMATE TRANSFERS HAVE OCCURRED.

STATE OF NEW MEXICO
CORRECTIONS DEPARTMENT

Plaintiff's
**EXHIBIT 1**

**WALLENS RIDGE
STATE PRISON**

# Memo

**To:**      INMATE POPULATION

**From:**   MAJOR T. YATES

**Date:**   11/12/99

**Re:**      STRIP SEARCH PROCEDURE

---

LATELY THERE HAS BEEN SOME CONFUSION ABOUT THE STRIP SEARCH PROCEDURE HERE AT WALLENS RIDGE STATE PRISON. THIS MEMO WILL CLEAR UP ANY QUESTIONS YOU MAY HAVE ABOUT THIS PROCEDURE.

ANY TIME A STRIP SEARCH IS CONDUCTED THE INMATE WILL BE REQUIRED TO STRIP OFF ALL HIS CLOTHING, TURN AROUND SLOWLY, PUT HIS HANDS ON HIS BUTTOCKS, SPREAD HIS BUTTOCKS, SQUAT TO THE GROUND WHILE BUTTOCKS IS STILL SPREAD, AND COUGH HARD TWICE.

THIS PROCEDURE WILL BE FOLLOWED ANY TIME A SEGREGATION INMATE LEAVES HIS CELL FOR ANY REASON. THERE WILL BE NO EXCEPTIONS TO THIS PROCEDURE.

MAJOR T. YATES

**PLAINTIFF'S
EXHIBIT 2**

PENITENTIARY OF NEW MEXICO

/25

## ADMINISTRATIVE SEGREGATION PLACEMENT FORM

INMATE NAME: Steven Leewright                NMCD #: 41265
On November 15, 1999 at 2:45 p.m. time the above named inmate was placed in administrative segregation for

( ) Voluntary Ad.Seg.              ( X ) Involuntary Ad.Seg.

This placement was made:

____ 1.  At the inmate's request.  The written request is attached.

_X_ 2.  Based on a determination by the ranking shift officer that the inmate presents a threat to the security of the institution. See below for a detailed explanation of the recent overt act(s) or the reliable information which supported the determination.

____ 3.  Based on a determination by the ranking shift officer that the inmate's safety is jeopardized if he remains in general population.  See below for a detailed explanation of the recent overt act(s) or the reliable information which supported the determination.

Summary of Facts Which Justify Placement: Your placement is based on the alleged involvement in a disturbance while assigned to Guadalupe County Detention Center on August 31, 1999.  This resulted in your immediate transfer to a penal institution in the State of Virginia.
Your presence in any general population poses a threat to the Security of the institution warranting Administrative Segregation placement pending review of the ASCC.


Captain Mike Vigil                        November 15, 1999
Shift Supervisor                          Date

Receipt Acknowledged:
_____                   11/15/99   3:05 pm
Inmate Signature and NMCD #               Date and Time

Served by:
_____                   11/15/99   3:15 pm
Staff Member                              Date and Time


PLAINTIFF'S
**EXHIBIT 3**

**NEW MEXICO CORRECTIONS DEPARTMENT**
**ADMINISTRATIVE SEGREGATION CLASSIFICATION COMMITTEE**

NAME: _Steven Leonard t_   NMCD #: _41365_   INSTITUTION: _South_   UNIT: _1B_

TYPE OF REVIEW:   72 Hour _____   7 Day _____   30 Day _X_   Special _____

INMATE STATUS:   Involuntary _X_   Voluntary _____   DATE ENTERED: _11·13·99_

COMMITTEE ACTION: _Continue Inmate's Class A Based on his alleged involvement in a disturbance at CCCF_
_on 8·31·99. No further information concerning his involvement has been received, then refer to_

JUSTIFICATION: _CB's for transfer to PNMCF. (Not cleared for single occupancy)._

NEXT REVIEW: _5·6·00_   CHAIRMAN: _Collie McVann_   APPEARED _X_

MENTAL HEALTH REPRESENTATIVE: _____   SECURITY REPRESENTATIVE: _____ WAIVED _____

I HAVE BEEN INFORMED OF THE DECISION OF THE A.S.C.C. AND OF THE RIGHT TO APPEAL THESE DECISIONS BY FILING A
CLASSIFICATION APPEAL.

_4·6·00_
DATE                                        INMATE SIGNATURE _41365_
FORM-TL-E6-10/5/92   WHITE - Inmate File   CANARY - Classification Officer   PINK - Inmate   Printed By NM Corrections Industries Print Shop

**PLAINTIFF'S**
**EXHIBIT 4**

## MEMORANDUM OF UNDERSTANDING BETWEEN THE VIRGINIA DEPARTMENT OF CORRECTIONS AND THE NEW MEXICO DEPARTMENT OF CORRECTIONS

### DATE: 9-3-99

It is hereby directed that up to one hundred twenty five (125) inmates, as identified on the attached transfer memorandum, who are New Mexico Department of Corrections inmates that are currently incarcerated at the Guadalupe County Correctional Facility, be transferred to the custody of the correctional system of the State of Virginia, pursuant to the provisions of the Interstate Corrections compact as provided under Sections 53.1-216 and 53.1-217 of the *Code of Virginia* and Sections 91-5-17 and 31-5-18 of the New Mexico Statutes Annotated 1978, and under the existing Contract between the State of New Mexico and the State of Virginia For The Implementation of the Interstate Corrections Compact dated December 7, 1982 (specifically Section 27 of the Contract). These inmates are to be delivered to the custody of Virginia at the following location: The Wallens Ridge State Prison located near Big Stone Gap, Virginia.

The parties agree that for the purposes of this Memorandum that the Commonwealth of Virginia shall defend, at its expense, any claim arising from the conditions of confinement in Virginia Department of Corrections facilities and all excessive force and failure to protect claims brought by any inmates housed in any Virginia Department of Corrections facility; that the State of New Mexico shall be responsible for defending, at its expense, all legal proceedings, including but not limited to, actions brought against Virginia Officials relating to a New Mexico Inmate's conviction or sentence, any action arising out of the transfer per se of a New Mexico Inmate to a Virginia facility; and any suit brought against any New Mexico defendant; and that the New Mexico Corrections Department and Virginia Department of Corrections agree to fully cooperate with each other in defense of any action brought by a New Mexico Inmate or pertaining to a New Mexico Inmate.

Pursuant to Section 27 of the existing Contract, New Mexico shall pay the Commonwealth of Virginia a per diem of $64.00 per day per inmate. All other terms and conditions of the referenced existing Contract between the State of New Mexico and the State of Virginia shall apply. The term of this transfer is for up to one year, with the understanding that the transfer may last less than one year.

_____ (name)
ROBERT J. PERRY

_____ (title)
New Mexico Corrections Department

_____ (name)
Ron Angelone

_____ (title)
Director
Virginia Department of Corrections

Subscribed and sworn before me, a Notary Public, in and for the State of Virginia, this 3rd day of September, 1999.

My Commission Expires:

*Virginia Interstate Compact 9-99*
*Page 1*

**PLAINTIFF'S**
**EXHIBIT 5**

MEMORANDUM OF UNDERSTANDING BETWEEN
THE VIRGINIA DEPARTMENT OF CORRECTIONS AND
THE NEW MEXICO DEPARTMENT OF CORRECTIONS

03-31-2002

*Charlene J Davis*
Notary Public

Subscribed and sworn before me, a Notary Public, in and for the State of New Mexico, this _2nd_ day of _September_, 1999.

My Commission Expires:

7-31-2001

*Barbara H Murphy*
Notary Public

**Custody Transfer Certification:**

Custody of inmates received:

_____        _____        _____
(Print Name)                              Signature                                  Date

Witnessed by New Mexico Transporting Official:

_____        _____        _____
(Print Name)                              Signature                                  Date

Distribution:
Original to Unit Manager, Absconder and Extradition Unit; then to CCR
Institutional Criminal Record
Compact Coordinator
Designated Reception Center (when receiving inmates)
W#9, TR

*Virginia Interstate Compact 9.99*
*Page 2*